UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAN CARTER                          CIVIL ACTION

VERSUS                              NO.  05-2214

SUN LIFE ASSURANCE CO.              SECTION "R" (1)


**ORDER AND REASONS**

This is an action for review of the denial of life insurance benefits by the administrator of an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*.  Before the Court is defendant's motion for summary judgment.  For the following reasons, the Court GRANTS defendant's motion for summary judgment.

**I.    BACKGROUND**

Christopher Watson, plaintiff's son, worked for Tetra Technologies at the time of his death on March 12, 2003.  During his employment with Tetra, Watson was covered by a group term insurance policy issued by Sun Life as part of Tetra's employee benefits plan.  The policy included benefits for accidental death

if the insured sustained an "Accidental Bodily Injury" resulting in death.  (R. Doc. 10, Ex. 1 at AR 0025).  The plan defines Accidental Bodily Injury to mean "bodily harm caused solely by external, violent, and accidental means which is sustained directly and independently of all other causes." (*Id*. at AR 0012).  The policy also states that no accidental death benefits will be paid if the death results from intentionally self-inflicted injuries or the commission or attempted commission of an assault, felony or other criminal act.  Watson named plaintiff Jan Carter as the sole beneficiary of his accidental death coverage.

On March 12, 2003, Watson died from injuries sustained in a motor vehicle crash on Louisiana Highway 10.  The police report of the crash indicates that it was caused by Watson's attempt to pass another vehicle in a clearly marked no-passing zone.  (*Id*. at AR 0126-33).  Watson's car crashed into two oncoming vehicles and killed Debra Williams, the driver of the first car that he hit. (*Id*.).  Watson was pronounced dead at the scene.  (*Id*.). The officer who investigated the crash indicated that alcohol was present, although he did not make it clear in the accident report whether the alcohol was on Watson's person or in his vehicle. (*Id*. at AR 0126).  Both the Louisiana State Police Crime Laboratory and the Orleans Parish Coroner's Forensic Laboratory

2

tested Watson's blood alcohol concentration after the crash.
They found it to be .16 grams per deciliter of blood and .13
grams per deciliter of blood, respectively.  (*Id.* at AR 0115,
0133).  The coroner who performed Watson's autopsy noted a
"strong aroma of alcohol."  (*Id.* at AR 0117).  At the time of the
crash, Louisiana law defined the crime of operating a vehicle
while intoxicated as the operation of a motor vehicle by a driver
with a blood alcohol concentration of .10 grams or more per
deciliter.  La. Rev. Stat. 14:98(A)(1)(b) (2003) (amended by 2001
La. Acts No. 781, § 1).  Two witnesses to the crash reported that
Watson passed other vehicles in the no-passing zone immediately
before the crash.  (R. Doc. 10, Ex. 1 at AR 0131-32).

Jan Carter submitted a claim as the sole beneficiary under
her son's policy with Sun Life.  Sun Life paid benefits under the
basic life insurance and optional life insurance portions of the
policy, but it denied Ms. Carter's claim for accidental death
benefits.  Sun Life initially gave two reasons for denying
accidental death benefits:

1.  The injuries resulting in Mr. Watson's death were
    reasonably foreseeable and were the natural and
    probable result of conduct knowingly undertaken and
    therefore, were not due to accidental means.
2.  The operation of a motor vehicle under the influence of
    alcohol beyond the legal limit is considered an illegal
    act in the State of Louisiana, and therefore falls
    within the policy exclusion applicable to "committing
    or attempting to commit an assault, felony, or other

criminal act."

(R. Doc. 10, Ex. 1 at AR 0109).  Carter appealed the decision to

Sun Life's ERISA appeals committee and was again denied benefits.

In addition to restating its earlier reasons for denying her

claim, Sun Life added two reasons:

      3.    Vehicular homicide is the killing of a human being
caused directly by one engaged in the operation of a
motor vehicle, whether or not the offender had the
intent to cause death or great bodily harm, while under
the influence of alcohol beyond the legal limit, and is
also considered a criminal act in the state of
Louisiana.  As such, it also falls within the policy
exclusion applicable to "loss which...results
from...committing or attempting to commit an assault,
felony, or other criminal act."

      4.    The Louisiana State Police Crash Report and the Orleans
Parish Forensic Lab results show that Mr. Watson's
voluntary consumption of alcohol, in conjunction with
his blood alcohol content (measured at 0.13% and 0.16
grams), seriously impaired Mr. Watson's judgment and
ability to control his vehicle at the time of the
accident, costing both Mr. Watson and Ms. Williams
their lives.  The injuries were thus reasonably
foreseeable and the policy exclusion for self-inflicted
injuries therefore also applies in this case.  See
*Nelson v. Sun Life Assurance Co. of Canada*, 962 F.
Supp. 1010 (W.D. Mich. 1997).

(*Id*. at AR 0041).  Carter then sued Sun Life in this Court.  Sun

Life has moved for summary judgment.

## II.  LEGAL STANDARD

### A. Summary Judgment Standard

Summary judgment is appropriate when there are no genuine

issues as to any material facts, and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party.  *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial.  *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

**B. ERISA Review**

It is undisputed that plaintiff's claim under Sun Life's policy is governed by the Employee Retirement Income Security Act

5

of 1974, 29 U.S.C. § 1001 *et seq.*, and that federal law governs the issues presented here, including the construction of the policy provisions. *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1451 (5th Cir. 1995). Congress, in adopting ERISA, expected that "a federal common law of rights and obligations under ERISA-regulated plans would develop." *Id.* (*quoting Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987)). State law may be used as a basis for federal common law only to the extent that state law is not inconsistent with congressional policy concerns. *Id.*

Under ERISA, a claims administrator must make two findings to determine whether an employee is entitled to benefits under a plan. *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998)(citing *Pierre v. Conn. Gen. Life Ins.*, 932 F.2d 1552, 1557 (5th Cir. 1991)). The administrator must first determine the facts underlying the claim for benefits. *Id.* (citing *Pierre*, 932 F.2d at 1562). The administrator must then "determine whether those facts constitute a claim to be honored under the *terms* of the plan." *Id.* (emphasis in original). If the administrator denies benefits to the participant, section 1132 of ERISA authorizes the employee to bring suit in federal district court "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to

6

clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

When a plan grants the administrator discretion to determine claims for benefits, a claimant may recover under ERISA only if the administrator's rejection of his or her claim was an abuse of discretion.  *See Atteberry v. Memorial-Hermann Healthcare Sys.*, 405 F.3d 344, 347 (5th Cir. 2005).  The parties agree that the plan vests Sun Life with such discretion.  In this case, Sun Life has an "inherent conflict of interest" because it serves both as the administrator and insurer under the plan.  *See Lain v. UNUM Life Ins.*, 279 F.3d 337, 343 (5th Cir. 2002).  A conflicted administrator merits less deference.  *See Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999) (en banc).  The Court applies a "sliding scale" to determine how much deference to give: "[t]he greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be."  *Id.* at 297.  When, as here, the insurer and administrator are the same entity but plaintiff submits no further evidence to demonstrate a conflict, the Court  grants the administrator "all but a modicum" of the deference afforded to unconflicted administrators.  *Lain*, 279 F.3d at 343.  Under this standard, the basis for Sun Life's decision must be supported by "some concrete evidence in the administrative record."  *Vega*, 188

F.3d at 302.

The Court reviews a claims administrator's fact findings regarding the eligibility of a claimant based on the evidence before the administrator, provided the administrator gave both parties an opportunity to submit evidence. *Schadler*, 147 F.3d at 395 (citing *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 639 (5th Cir.), *modified on other grounds*, 979 F.2d 1013 (5th Cir. 1992)). In other words, the Court is confined to the administrative record when it reviews Sun Life's fact findings.

In contrast, the Court is not confined to the administrative record when it reviews the administrator's interpretation of the plan's terms. *Wildbur*, 974 F.2d at 639.  In this arena, the Court first must inquire whether the administrator's interpretation was the legally correct interpretation. *Id*. at 637.  Specifically, the Court should consider whether the administrator gave the plan a uniform construction, whether the interpretation is consistent with a fair reading of the plan, and whether unanticipated costs might arise from different interpretations of the plan. *Id*. at 638.  Second, if the administrator's interpretation was not legally correct, the Court must determine whether the administrator abused its discretion in interpreting the plan's terms. *Id*.  Specifically, the Court should consider the internal consistency of the plan under the

administrator's interpretation, any relevant regulations promulgated by the appropriate administrative agencies, the facts of the case and any indications of bad faith.  *Id*.  "[S]ome evidence other than that contained in the administrative record may be relevant at both steps" of the Court's review of the administrator's interpretation of the plan.  *Id*.

## III. DISCUSSION

### A.   Whether Watson's Death was an Accident

Carter contends that it was an abuse of discretion for Sun Life to determine that her son's death was not accidental within the terms of the policy.  As noted, the plan defines Accidental Bodily Injury as "bodily harm caused solely by external, violent, and accidental means which is sustained directly and independently of all other causes."  The term "accidental means" is not further defined.  In *Todd v. AIG Life Insurance*, 47 F.3d 1448 (5th Cir. 1995), the Fifth Circuit adopted the First Circuit's test in the seminal *Wickman* case for determining whether a death is an accident under the terms of an accidental death policy.  47 F.3d at 1456 (referring to *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077 (1st Cir. 1990).

In *Wickman*, the insured was seen standing on the outside of the guardrail of a bridge, holding on to the guardrail with only

one hand, then free-falling to the railroad tracks some 40 or 50 feet below. *Wickman*, 908 F.2d at 1080.  The insured survived the fall, but eventually died after he told hospital personnel that he had jumped off the bridge. *Id*. at 1080.  The accidental death provisions of the ERISA plan provided by the insured's employer defined accident as "an unexpected, external, violent and sudden event." *Id*. at 1080.  The plan also specifically excluded benefits if the loss was caused by "suicide or intentionally self-inflicted injury, whether . . . sane or insane." *Id*. at 1081.  The insurer denied a claim for accidental death benefits. *Id*.  The magistrate judge who tried the case ruled that "Wickman knew or should have known that serious bodily injury or death was a probable consequence substantially likely to occur" as a result of his conduct and upheld the insurer's determination.  *Id*.

On appeal, the First Circuit affirmed the magistrate's judgment and laid out an analytical framework for determining whether an insured's death or injury was an "accident" based on (1) a determination of the insured's actual expectations, when possible; (2) a determination of whether the insured's actual expectations were reasonable from an objective viewpoint; and, when actual expectations can not be determined, (3) a determination of the probability of the actual outcome from the

perspective of the insured.[1]   The *Wickman* court described how a
factfinder ought to proceed when the insured's subjective
expectations could not be known, specifying that the inquiry goes
to whether a reasonable person, similarly situated, would view
the injury as highly likely to occur:

> [T]he fact-finder should then engage in an objective
> analysis of the insured's expectations.  In this
> analysis, one must ask whether a reasonable person,
> with background and characteristics similar to the
> insured, would have viewed the injury as *highly likely*
> *to occur* as a result of the insured's intentional
> conduct.  An objective analysis, when the background
> and characteristics of the insured are taken into
> account, serves as a good proxy for actual expectation.
> Requiring an analysis from the perspective of the
> reasonable person in the shoes of the insured fulfills
> the axiom that accident should be judged from the
> perspective of the insured.

*Id*. at 1088 (emphasis added and internal citations omitted).  The
court held that the magistrate's finding "equates with a
determination either that Wickman expected the result, or that a
reasonable person in his shoes would have expected the result,
and that any other expectation would be unreasonable."  *Id*. at
1089.  The question in the third *Wickman* determination is thus
not whether an injury was merely foreseeable by a reasonable
person, but whether a reasonable person with the same background

---

[1] The *Wickman* court noted there may only be "vague clues" as
to what a decedent was thinking at the time of the accident,
which would necessitate the third determination.  *Wickman*, 908
F.2d at 1088.

and characteristics of the insured would view the injury as
"highly likely to occur," a more exacting standard.

In *Todd*, the policyholder died during autoerotic
asphyxiation, the practice of limiting the flow of oxygen to the
brain during masturbation in an attempt to heighten sexual
pleasure.  *Todd*, 47 F.3d at 1450.  The district court, in
accordance with the first *Wickman* step, determined from evidence
about the positive aspects of the decedent's life that he did not
intend or expect to die from his conduct.  *Id*. at 1456.  The
court then asked whether this expectation was reasonable, finding
that an unreasonable expectation would arise when "the conduct
from which the insured died posed such a high risk of death that
his expectation of survival was objectively unrealistic."  *Id*.
The district court held that the risk of death must reach the
level of "substantial certainty" before the death could be held
to be accidental.  *Id*.  On appeal, the Fifth Circuit pointed out
that the district court quoted the "substantially likely"
language from the magistrate's opinion in *Wickman*, and noted that
the First Circuit in *Wickman* had found that language to be the
equivalent of "highly likely to occur."  *Id.*  The Fifth Circuit
observed that "the [district] court adopted the essentials of the
*Wickman* approach," and found that its holding was appropriate.
*Id*.  The court then proceeded to the only remaining question,

12

which  was "whether the district court erred in holding that . .
. the autoerotic conduct in this case did not risk death to a
substantial certainty (or its equivalents)." *Id*.  The court
examined evidence from academic studies and expert findings in
similar cases indicating that death from the practice was
unusual.  *Id*. at 1457.  The court found that the likelihood of
death from this activity fell "far short of what would be
required to negate coverage under the policy." *Id*. at 1456.  The
*Todd* court's analysis of this evidence appears to have been
conducted under the second *Wickman* determination, since it
accepted the district court's finding that the insured did not
intend to die.

The Fifth Circuit reaffirmed aspects of the *Wickman* approach
in *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388 (5th Cir.
1998), in which the insured died from a self-administered mix of
illegal drugs.  The court ruled that a plan administrator, in
applying a self-inflicted injury exclusion, must consider facts
bearing on the subjective intent of the insured, the first
*Wickman* determination.  *Schadler*, 397 n.10.  The court then said
that the administrator must ask "whether a reasonable person,
with background and characteristics similar to the insured, would
have viewed the injury as highly likely to occur as a result of
the insured's intentional conduct." *Id*. (quoting *Wickman*).

13

Thus, while the Fifth Circuit has never squarely applied all three *Wickman* determinations to the same case, the *Wickman* approach is followed in this circuit and is the standard by which an administrator's determination is to be measured.  Whether the factfinder is evaluating the known subjective expectations of the insured or determining the reasonable expectations of an imagined individual with the insured's background and characteristics, the crucial inquiry is whether death would be viewed as highly likely to occur from the insured's conduct.

The *Wickman* standard avoids the problem of using a standard of exclusion that is so broad that it eliminates many injuries that plan participants would reasonably expect to be covered.  ERISA requires that plan descriptions "be written in a manner calculated to be understood by the average plan participant."  29 U.S.C. § 1022(a).  As the Eighth Circuit observed in *King v. Hartford Life and Accident Ins. Co.*, 414 F.3d 994, 1002 (8th Cir. 2005), a "reasonably foreseeable standard is quite broad; if all reasonably foreseeable accidents are excluded from coverage, then the definition of accident may frustrate the legitimate expectations of plan participants, for insurance presumably is acquired to protect against injuries that are in some sense foreseeable."  In his concurrence with the Eighth Circuit's *en banc* decision in *King*, Judge Bright gave the following example of

14

how a reasonably foreseeable standard could convert obvious accidents into uncovered, foreseeable events: "When a woman stands on a shaky stool to reach for a bottle of baby formula on the top shelf of the cupboard, it is reasonably foreseeable that she will fall and, in crashing to the kitchen counter and then to the floor, break her neck.  Under the plan administrator's definition [of reasonably foreseeable], the woman's injury is not an accident."  *Id*. at 1008 (Bright, J., concurring).

Here, the record contains no evidence that Watson subjectively intended to die.  Sun Life apparently made no effort to investigate whether Watson intended to cause his own death. With no information as to Watson's subjective expectations, Sun Life was obligated to determine whether a reasonable person of Watson's background would have viewed his injuries as *highly likely* to occur as a result of his conduct.  However, Sun Life based its determination on a plan interpretation that would exclude coverage if Watson's death was "reasonably foreseeable and . . . the natural and probable result" of his conduct.  This interpretation uses two standards, "reasonably foreseeable" and "natural and probable result," which the courts have treated as synonymous.  *See Jennings v*. Jennings, 109 F.3d 477, 480 (8th Cir. 1997); *Purdy v. Commodity Futures Trading Comm'n*, 968 F.2d 510, 519 n.22 (5th Cir. 1992); *Gen'l Am. Life Ins. Co. v. Priest*,

301 F.2d 390, 394 (10th Cir. 1962).  This standard is inconsistent with the standard laid out in *Wickman* and followed in *Todd*, which requires that the factfinder ask whether a reasonable person, similarly situated, would view death as highly likely to occur from the insured's conduct.  The difference between the two standards is material, and Sun Life's interpretation of the plan term was unreasonable and legally incorrect.

Several federal courts have upheld an insurer's decision to deny benefits to an insured who is killed while driving drunk. *See Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1110-11 (7th Cir. 1998); *Mullaney v. Aetna U.S. Healthcare*, 103 F. Supp. 2d 486, 493-94 (D.R.I. 2000); *Miller v. Auto-Alliance Int'l, Inc.*, 953 F. Supp. 172 (E.D. Mich. 1997); *Walker v. Metro. Life Ins. Co.*, 24 F. Supp. 2d 775, 781 (E.D. Mich. 1997); *Schultz v. Metro. Life Ins. Co.*, 994 F. Supp. 1419, 1422 (M.D. Fla. 1997); *Nelson v. Sun Life Assurance Co. of Can.*, 962 F. Supp. 1010, 1012-13 (W.D. Mich. 1997); *Fowler v. Metro. Life Ins. Co.*, 938 F. Supp. 476, 480 (W.D. Tenn. 1996).  These cases have typically accepted the argument that the insured should have foreseen the dangers of driving while intoxicated because they are "widely known and widely publicized." *See, e.g. Miller*, 953 F. Supp. at 176; *Fowler*, 938 F. Supp. at 480; Michael E. Gardner, *Accidental*

16

*Death Insurance Coverage of Drunk Drivers*, 69 Mo. L. Rev 235, 245 (2004).  Although a number of these cases cite the *Wickman* "highly likely" standard, none relies on empirical or expert evidence to reach its conclusion that the death of a driver under the influence is not an accident as a matter of law.

Other federal courts have taken a more skeptical approach to the contention that drunk driving is so dangerous that a resultant death could not be accidental.  In *Harrell v. Metropolitan Life Ins. Co.*, 401 F. Supp. 2d 802, 812 (E.D. Mich. 2005), the court pointed out that "statistics do not seem to bear out the inevitability of death flowing ineluctably from drunken driving," and it held that other courts had "confounded the 'highly likely to occur' test with a 'reasonably foreseeable' standard."  In *Metropolitan Life Ins. Co. v. Potter*, 992 F. Supp. 717 (D.N.J. 1998), the court criticized many of the above-cited decisions as failing to utilize the *Wickman* analysis, which it noted was "followed (and perhaps expanded) in *Todd*."  That court noted that "many drunken drivers survive (to be prosecuted or perhaps to repeat) their risky conduct."  *Id*. at 730.  Indeed, Judge Bright pointed out in *King, supra,* that deaths from accidents in which drunk driving is a factor constitute less than one percent of the number of people arrested for drunk driving each year.  *King*, 414 F.3d at 1007 (Bright, J., concurring).  In

17

a lengthy analysis of the direction of the caselaw in this area, the court in *West v. Aetna Life Ins. Co.*, 171 F. Supp. 2d 856 (N.D. Iowa 2001), also criticized earlier decisions in other courts for an analysis that was out of line with the requirements of *Wickman* and held that "the leap cannot be made from serious risks . . . that are widely publicized to the conclusion that a drunk driver knew or should have known that the consequences of driving while intoxicated are that he or she is highly likely to suffer injury or death." 171 F. Supp. 2d at 903. The *West* court examined evidence showing that in 1996 there were 1,033,000 arrests for driving under the influence of alcohol and only 17,218 fatalities in crashes in which alcohol was a factor, making it far more likely that a drunk driver will be arrested for driving while intoxicated than that he will be killed in a alcohol-related crash. *Id*. at 904. The court in *West* agreed that driving drunk is irresponsible and dangerous, but it found that this does not demonstrate "that driving while intoxicated is so highly likely to result in death that any other expectation is unreasonable." *Id*.

Although the Court agrees with the analysis of the courts that reject the unsupported assumption that drinking and driving makes death so highly likely to occur that no other expectation is reasonable, it need not reach this issue. Here, Sun Life

18

evaluated plaintiff's claim through the prism of a legally incorrect test.  Its interpretation of the word "accident" was at odds with the Fifth Circuit test and was unreasonable.  Further, it amounted to an abuse of discretion by the plan administrator. For these reasons, the decision to deny benefits cannot stand on this basis.  Ordinarily, this would trigger a remand so that Sun Life could evaluate the claim under the appropriate test. Because the court grants summary judgment to Sun Life on other grounds, remand is not in order.

> **B.   Whether Watson's Death Resulted from Commission of a Driving While Intoxicated, a Criminal Act**

Sun Life also denied Carter's claim on the grounds that operating a motor vehicle under the influence of a specified amount of alcohol is a criminal act in the State of Louisiana, and Watson's policy specifically excludes coverage for "loss which results from . . . committing or attempting to commit an assault, felony or other criminal act."  Carter argued before the administrator that a violation of the Louisiana driving while intoxicated statute is punished as a misdemeanor.  The Louisiana statute in issue is located in the criminal code, and at the time of Watson's death, it defined "the *crime* of operating a vehicle while intoxicated."  La. Rev. Stat. 14:98(A)(1)(b) (2003) (amended by 2001 La. Acts No. 781, § 1) (emphasis added) (defined

19

as operating a vehicle with a "blood alcohol concentration [of] 0.10 percent or more by weight based on grams of alcohol per one hundred cubic centimeters of blood").  Further, courts have upheld denials of coverage under criminal act exclusions for actions constituting misdemeanors.  *Allstate Ins. Co. v. Burrough*, 120 F.3d 834, 840 (8th Cir. 1997); *N. Atl. Cas. & Sur. Ins. Co. v. William D.*, 743 F. Supp. 1361, 1363 (N.D. Cal. 1990); *see also Canada Life Ins. Co. v. Pendleton Memorial Methodist Hosp.*, 1999 WL 243653, *3-4 (E.D. La. 1999).

Both tests performed on Watson after his death indicated that his blood alcohol level exceeded the legal limit.  The record does not contain any evidence to suggest that the tests were in error.  Moreover, the investigating officer noted the presence of alcohol, and the coroner detected a "strong aroma of alcohol."  Carter argues that the blood alcohol tests are "inherently suspect" because they indicated different concentrations of alcohol in Watson's blood.  This argument is not sufficient to sustain a claim of abuse of discretion, because the administrator may weigh the available evidence and make determinations as to its weight.  Both tests indicated that Carter's blood alcohol concentration was above the legal limit.

Carter also argues that Sun Life abused its discretion by finding that Watson committed a crime because no charges were

filed by any law enforcement authority.  The Fifth Circuit
rejected a similar argument in *James v. Louisiana Laborers Health
and Welfare Fund*, 29 F.3d 1029, 1034 (5th Cir. 1994), observing
that when the insured is killed in the course of his criminal
conduct, it would be illogical to require that the state
prosecute the insured before he could be considered to have
committed a crime.

Here, two independent tests indicated that Watson's blood
alcohol exceeded the legal limit.  These results were sufficient
to support a finding that Watson was in violation of the law at
the time the accident occurred.  Moreover, given the other
indications in the record about Watson's driving before the
crash, there is evidence that he was driving recklessly at the
time of the crash, which is behavior associated with intoxication
and the loss of control caused by it.  There is also no evidence
in the record to suggest another possible cause of the crash.  It
was thus reasonable for Sun Life to infer that Watson's
intoxication was the but-for cause of his death.  *Steele v. Life
Ins Co. of N. America*, 408 F. Supp. 2d 627, 631 (C.D. Ill. 2006).
In *Canada Life*, Judge Marcel Livaudais of this Court rejected out
of hand an argument that driving while intoxicated was not the
cause of the injuries suffered by a 16-year old with a blood-
alcohol level of five times the legal limit who lost control of

his vehicle and sustained severe injuries.  The court found no genuine issue of material fact that plaintiff's injuries resulted from committing the criminal act of driving while intoxicated. This Court likewise finds that there are no genuine issues of material fact that Sun Life did not abuse its discretion in denying benefits to Carter on the grounds that Watson's death was caused by his committing the criminal act of driving while intoxicated.  For the sake of completeness, the Court examines Sun Life's other proffered explanations.

### C.   Whether Watson's Death Resulted from Commission of a Vehicular Homicide, a Criminal Act

In Louisiana, vehicular homicide is defined to be "the killing of a human being caused . . . by an offender engaged in the operation of . . . any motor vehicle . . . whether or not the offender had the intent to cause death or great bodily harm, whenever . . . [t]he operator's blood alcohol concentration is 0.08 percent or more . . . [or] [t]he operator is under the influence of alcoholic beverages."  La. Rev. Stat. 14:32.1(A). In order to be convicted under the statute, the state must prove only that "an offender's unlawful blood alcohol concentration combined with his operation of a vehicle to cause the death of a human being . . . . [E]xcept for the offender's unlawful blood alcohol concentration during his operation of a vehicle, the

22

state is not required to prove any negligence on his part as an essential element of the crime." *State v. Taylor*, 463 So.2d 1274, 1275 (La. 1985).  However, the mere coincidence of alcohol use and a fatal accident is not sufficient, the statute is only intended to punish those persons "whose alcohol consumption actually causes [a] highway death[]." *Id*.  Consequently, there must be a causal connection between the defendant's blood alcohol level and a fatal accident.  *Id.; see also State v. Bailey*, 905 So. 2d 303, 306 (La. Ct. App. 2005); *State v. Bradford*, 700 So. 2d 1046, 1048 (La. Ct. App. 1997); *State v. Gibson*, 693 So. 2d 286, 290 (La. Ct. App. 1997).  In *Bradford*, the court found that evidence that the defendant's blood alcohol level was .16 g/dl, that he smelled strongly of alcohol, and that he had swerved into oncoming traffic was sufficient to support a conviction for vehicular homicide.  *Bradford*, 700 So. 2d at 1048.  In *Gibson*, the court found that evidence that the defendant's blood alcohol level was .17 g/dl, that the highway was dry and without any defects, that there were no other cars in the area, that defendant did not point to any mechanical or tire failure that might have caused the collision, and that the defendant crossed a highway median before hitting another defendant head-on was sufficient to support a conviction for vehicular homicide. *Gibson*, 693 So. 2d at 287-89.  By contrast, in *Bailey* the court

23

found that when the defendant rear-ended a car that was stopped on the highway at night with its lights off or dimmed, the evidence was insufficient to support a conviction for vehicular homicide, even though the investigating officer concluded that the defendant was intoxicated at the time of the accident. *Bailey*, 905 So. 2d at 310.  The *Bailey* court found that "the accident was unavoidable," precluding criminal liability.  *Id*.

Here, the investigating officer concluded that Watson illegally crossed the center line and ran head-on into Debra Williams' vehicle, killing her.  He then collided with a second vehicle, but at such a lower speed that the other driver's injuries were minor, indicating that the bulk of Watson's injuries were incurred in the initial crash.  Two witnesses observed Watson illegally crossing the center line to pass other vehicles before the crash.  Two post-mortem tests indicated that his blood alcohol concentration was well above the legal limit. Plaintiff has posited no other cause of the crash.  Based on the construction given the vehicular homicide statute in Louisiana, there was sufficient evidence in the administrative record to support Sun Life's determination that Watson died in the commission of a vehicular homicide.  *See also Thomas v. Life Ins. Co. of N. America*, 1998 WL 378138 *3 (E.D. La. 1998), *aff'd*, 184 F.3d 815 (5th Cir. 1999); *cf. Weisenhorn v. Transamerica*

24

*Occidental Life Ins. Co.*, 769 F. Supp. 302, 306 (D. Minn. 1991) (finding that a felony exclusion clause applied when the insured crashed into an oncoming truck while intoxicated and injured her passenger); *McDaniel v. Sierra Health and Life Ins. Co.*, 53 P. 3d 904, 908 (Nev. 2002) (finding that a felony exclusion clause applied when the insured failed to negotiate a turn while intoxicated, flipped over a guardrail and injured his passenger).

    **D.    Whether Watson's Death was the Result of Self-Inflicted Injuries.**

It is an abuse of discretion for a claims administrator to deny benefits under a self-inflicted injury clause when the insured person did not intend his own injury. *Schadler v. Anthem Life Ins. Co.*, 224 F.3d 766 (5th Cir. 2000) (unpublished opinion). In *Schadler*, the Fifth Circuit held that a plan administrator abused its discretion in denying accidental death benefits when the decedent intended to use drugs but did not intend his drug use to result in his death. *Id*. The *Schadler* court pointed out that "the plain meaning of 'injury' is not the equivalent of the physical action," such that drug use did not constitute an injury under the plan. *Id*. In *Harrell* and *King*, *supra*, the courts held that intentionally drunk driving was not equivalent to causing a self-inflicted injury and that such a definition would offend the plain meaning of the term. *See King*,

414 F. 3d at 1004 (holding that a natural reading of the self-inflicted injury exclusion does not include injuries that were unintended by the participant, but that were contributed to by alcohol intoxication); *Harrell*, 401 F. Supp. 2d at 811 (holding that it was unreasonable to equate voluntarily partaking in risky behavior like drunk driving with an intent to injure one's self). Here, while the record supported the inference that Watson intended to drink and drive, there was no evidence that he subjectively intended to harm himself.  Drinking and driving, like the use of illicit drugs, is risky behavior frequently engaged in by people who do not seek to injure themselves. Because the decision to drink and drive without the intent to cause injury is insufficient to support a denial of benefits, Sun Life's decision can not be upheld on this basis.


**IV.   CONCLUSION**

For the reasons stated above, Sun Life did not abuse its discretion in finding that Watson was not eligible for accidental death benefits.  Consequently, summary judgment in favor of defendant is GRANTED.

New Orleans, Louisiana, this <u>11th</u> day of May, 2006.

_Sarah Vance_

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE